**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JEFFREY JEANNOT, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 18-1977 |
| | : | |
| PHILADELPHIA HOUSING AUTHORITY, | : | |
| BRANVILLE G. BARD, JR., Chief of Police (in | : | |
| his individual and official capacities), and | : | |
| WILIAM BRITT, Inspector (in his individual and | : | |
| official capacities), | : | |
| | : | |
| Defendants. | : | |
| | : | |

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                    **DECEMBER 19, 2018**

Plaintiff Jeffrey Jeannot ("Jeannot") brings this action against Defendants Philadelphia
Housing Authority (the "Housing Authority"), Branville G. Bard, Jr. ("Bard"), and Wiliam Britt[1]
("Britt"), alleging violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101
*et seq.*, the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. § 951 *et seq.*, and
the Equal Protection Clause and Due Process Clause of the Fourteenth Amendment under 42
U.S.C. § 1983.

Defendants move to partially dismiss the Second Amended Complaint, contending that
Jeannot fails to state a claim upon which relief can be granted.  Jeannot has filed a Response in

---

[1] As we noted when deciding Defendants' Motion to Dismiss the First Amended Complaint, Jeannot's original
complaint and First Amended Complaint both style Britt's first name as "Wiliam" in the caption.  Since, at that time,
neither party had moved to amend the case caption, we adopted the same spelling.  For the same reason, we continue
to do that again here, despite a signed document by Mr. Britt being attached to Jeannot's Response in Opposition to
Defendants' Motion to Dismiss the Second Amended Complaint that clearly shows his name as "William."

Opposition to Defendants' Motion to Dismiss the Second Amended Complaint. For the reasons

noted below, Defendants' Motion is granted in part and denied in part.

## I.     BACKGROUND[2]

The Housing Authority manages and operates a police department commonly known as

the "Philadelphia Housing Authority Police Department." (Second Am. Compl. ¶ 8.) Jeannot

began working there as a police officer in approximately September 2014. (*Id.* ¶ 16.)

On May 7, 2017, Jeannot was working a shift from 7:00 PM to 7:00 AM with his partner

for the night, Officer Roland Rodgers ("Officer Rodgers").[3] (*Id.* ¶ 17.) During his personal time

on the shift, Jeannot filled a prescription for Adderall at a Rite Aide. (*Id.* ¶ 18.) Jeannot alleges

that his physician prescribed Adderall "so that he could maintain the focus, concentration and

cognitive functions necessary for him to perform his duties as a police officer." (*Id.* ¶ 19.) He

further claims that he provided prior notice to his supervisor that he was prescribed Adderall.

(*Id.*)

Later that night, Jeannot and Officer Rodgers responded to a domestic dispute "which

[Jeannot] resolved peacefully." (*Id.* ¶ 20.) Jeannot claims that Officer Rodgers secretly recorded

him during the response to the domestic call and was away from the patrol car speaking on the

phone for a significant amount of time. (*Id.*) According to Jeannot, Officer Rodgers recorded

him at the instruction of Defendants because of "the Defendants' perception and suspicion that

[he] was abusing his prescription medication and/or other narcotics, acting erratic as a result of

---

[2] We take the facts alleged in the Second Amended Complaint as true, as we must when deciding a motion under Federal Rule of Civil Procedure 12(b)(6). *See Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (citation omitted).

[3] At times, Officer Rodgers' name is spelled "Rodgers" or "Rogers." (*Compare* Second Am. Compl. ¶ 17, *with* ¶¶ 20–21.) For consistency, we will utilize the former.

abusing such prescription . . . and otherwise behaving in a manner which purportedly made him unfit to perform his duties . . . ." (*Id.* ¶ 21.)

On the morning of May 8, 2017, at approximately 1:50 AM, Officer Rodgers received a call from the sergeant who said to return to the police headquarters to complete some "Municipal Police Officer Training." (*Id.* ¶ 22.) When Jeannot and Officer Rodgers returned to the headquarters, the on-duty sergeant informed Jeannot that he could go home early, or else he would have to sit in the office for the remainder of the shift without anything to do. (*Id.* ¶¶ 22–23.) Jeannot went home around 3:45 AM and provided his patrol log and paperwork for the night to Sergeant Matthew Richardson, who said, "Ok, you're good to go. See you later." (*Id.* ¶ 24.)

Later that same day, Jeannot received a knock on his front door from Lieutenant Hakeem Dunbar ("Lt. Dunbar"). (*Id.* ¶ 26.) Lt. Dunbar informed Jeannot that he was under investigation and was being placed on restrictive duty, but he would not give a reason why such actions were being taken. (*Id.*) Because Jeannot was placed on restrictive duty, he was required to provide Lt. Dunbar with his locker combination for his firearm. (*Id.*) Additionally, Lt. Dunbar told Jeannot that he was required to come to his shift the following day in business casual clothing, rather than in his uniform. (*Id.*) Lt. Dunbar said he could not speak about the reason for restrictive duty, but he asked whether anything "unusual happened" the previous night and whether Jeannot "was . . . not feeling well the night before." (*Id.* ¶ 27.) Jeannot believes these inquiries to mean Defendants perceived him as "having abused his prescription medication and was purportedly acting in an erratic manner thereby affecting his ability to perform the essential functions of his duties as a police officer." (*Id.* ¶¶ 25, 28.)

When Jeannot arrived for his next shift, Lt. Dunbar stated he was taking Jeannot to Episcopal Hospital for a drug test based on reasonable suspicion. (*Id.* ¶ 29.) Jeannot inquired why, if he was on reasonable suspicion on the night/early morning of May 7 and 8, 2017, did the police department not require a drug test then. (*Id.* ¶ 31.) Lt. Dunbar responded that the sergeant had made a mistake, but that if everything came back clear, Jeannot would be back working on the street in a few days. (*Id.* ¶¶ 30–31.)

On May 9, 2017, Jeannot received a call from his union shop steward "confirming that Defendants perceived Plaintiff as acting in an erratic manner due to an alleged abuse of Adderall or some other prescription drug/opioid." (*Id.* ¶ 32.) The following day, another union member informed Jeannot that he "should 'tell the truth about whether the drug screening would reveal some other narcotic.'" (*Id.* ¶ 33.) The union member said that if Jeannot was abusing his prescription medication, "they could get 'ahead of this' and get [Jeannot] into drug 'rehab.'" (*Id.*) "Lastly, the union representative[] added that, based upon the Defendants' perception of [Jeannot's] drug abuse, if any other narcotic or opioid was revealed in the drug screening, [Jeannot] would be 'screwed.'" (*Id.*) Jeannot assured the union member that he was "confident that no other narcotic/opioid would be revealed in the drug screening and that he believed the Defendants' perception of his alleged drug abuse was unfounded." (*Id.* ¶ 34.)

Jeannot asserts that several police officers confirmed that Defendants perceived Jeannot as a potential prescription drug abuser and unable to perform his job. (*Id.* ¶ 35.) Jeannot further alleges that Defendants "approached several officers and asked them whether they had observed anything unusual about [Jeannot's] behavior while on duty." (*Id.* ¶ 36.)

On May 26, 2017, Jeannot was placed on suspension with a recommendation for "Discharge/Probationary Separation." (*Id.* ¶ 37.) Allegedly, Defendants did not provide him

with the results of the drug test or an opportunity to make a statement in response to the reasonable suspicion of his apparent drug use. (*Id.* ¶¶ 39–40.) Regarding his use of Adderall, Jeannot claims that he "has a written doctor's note stating that his prescription of Adderall would not interfere with his ability to perform his duties as a police officer." (*Id.* ¶ 41.) He further avers that the doctor's note "demonstrate[s] that the Adderall was a reasonable accommodation to assist with his mental thinking, focus and concentration and allow him to perform the essential functions of his position" as a police officer. (*Id.*)

Jeannot asserts that Defendants have failed to comply with the written directives relating to his discipline or administration of the drug test. (*Id.* ¶ 42.) Despite numerous demands for an explanation of Defendants' actions, Jeannot has not received a clear response. (*Id.*) Jeannot filed a grievance with his union to seek redress of Defendants' conduct and disciplinary action. (*Id.* ¶ 44.) According to Jeannot, Defendants did not "engage in any interactive discussions to discuss his prescription of Adderall, potential reasonable accommodations, or any other concerns regarding" Jeannot's ability to perform his duties as a police officer. (*Id.* ¶ 45.) Defendants ultimately terminated his employment. (*Id.* ¶ 50.)

## II.    PROCEDURAL HISTORY

Jeannot timely filed suit in this Court following his charge of discrimination with the Equal Employment Opportunity Commission and his receipt of a right-to-sue letter. (*Id.* ¶¶ 4–6.) In response to Defendants' first Motion to Dismiss, he filed a First Amended Complaint that contained seven counts. Counts I and II alleged actual and perceived disability discrimination in violation of the ADA and PHRA, respectively;[4] Count III alleged retaliation in violation of the PHRA; Count IV alleged aiding and abetting liability under the PHRA; Count V was under 42

---

[4] Count I was directed only towards the Housing Authority.

U.S.C. § 1983 for violations of the Equal Protection Clause of the Fourteenth Amendment;

Count VI was under § 1983 for retaliation in violation of the First Amendment; and Count VII

alleged violations of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et*

*seq.* (Doc. No. 9.)

Defendants again moved to dismiss the entire action pursuant to Federal Rule of Civil

Procedure 12(b)(6). (Doc. No. 11.) Before disposing of the motion, the Court signed a

"Stipulation for Partial Voluntary Dismissal of Claims" that dismissed Counts V through VII

without prejudice. (*See* Doc. No. 14.) On October 2, 2018, we issued an Order and

Memorandum Opinion ("October Order") that: (1) dismissed with prejudice Jeannot's claim of

actual disability discrimination in Counts I and II of the First Amended Complaint; (2) dismissed

without prejudice Jeannot's claim of perceived disability discrimination in Counts I and II; (3)

dismissed with prejudice Jeannot's claim of retaliation in Count III; and (4) dismissed without

prejudice Jeannot's claim of aiding and abetting liability in Count IV. (Doc. Nos. 18, 19.)

On October 12, 2018, Jeannot filed his Second Amended Complaint. Notably, it includes

many of the same claims found in the First Amended Complaint. Count I and II restate the

perceived disability discrimination claim, as well as the previously dismissed with prejudice

claim of actual disability discrimination. (Second Am. Compl. ¶¶ 59–68.) Count III again

alleges a state law claim for retaliation, which was also dismissed with prejudice. (*Id.* ¶¶ 69–71.)

Jeannot also reasserts his withdrawn claim of violations of the Equal Protection Clause of the

Fourteenth Amendment.[5] (*Id.* ¶¶ 75–88.) However, Jeannot has also included a new claim for

violations of the Due Process Clause of the Fourteenth Amendment. (*Id.* ¶¶ 89–103.)

---

[5] Jeannot also includes a paragraph referencing alleged violations of the FMLA. As we will discuss in more detail below, this appears to be a typographical error carried through from a previous version of Jeannot's complaint and does not require extensive analysis.

Defendants again filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) on October 23, 2018. (Doc. No. 21.) The present motion seeks dismissal of all claims, except for the perceived disability discrimination claims in Counts I and II.

## III. LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (internal quotation marks omitted). In deciding a motion to dismiss under Rule 12(b)(6), courts must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the nonmovant." *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016) (quoting *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 154 n.1 (3d Cir. 2014)) (internal quotation marks omitted). However, courts need not "accept mere[] conclusory factual allegations or legal assertions." *In re Asbestos Prods. Liab. Litig. (No. VI)*, 822 F.3d 125, 133 (3d Cir. 2016) (citing *Iqbal*, 556 U.S. at 678–79). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Twombly*, 550 U.S. at 555. Finally, we may consider "only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon [those] documents." *Davis*, 824 F.3d at 341 (quoting *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010)) (internal quotation marks omitted).

## IV.    DISCUSSION

### A.    Claims Previously Dismissed with Prejudice or Voluntarily Withdrawn

To better clarify the issues presented in the instant motion, we initially dismiss the actual disability discrimination claims in Counts I and II and the retaliation claim in Count III.  These claims were previously dismissed with prejudice in our October Order, and we adopt our reasoning as explained there to the present motion.  (October Order 6–7, 10–11.)

Likewise, we dismiss all references by Jeannot concerning any claims of FMLA violations.  The FMLA cause of action was voluntarily withdrawn by Jeannot on September 14, 2018.  (Doc. No. 14.)  Jeannot reiterates this in his Response in Opposition to Defendants' Motion to Dismiss by acknowledging that the claim was dismissed from the action.  (Pl.'s Resp. in Opp'n 1 n.1.)  Moreover, it is clear that the sole paragraph relating to an FMLA claim is an inadvertent inclusion, as there is no further mention of such a claim anywhere else in the Second Amended Complaint or Jeannot's briefing.

For these reasons, Defendants' Motion is granted with respect to Jeannot's actual disability discrimination claim in Counts I and II, retaliation claim in Count III, and any reference to an FMLA violation claim in paragraph 51.

### B.    Jeannot's Aiding and Abetting Claim under the PHRA against Defendants Bard and Britt

As we set forth in our October Memorandum Opinion, under the PHRA, it is unlawful for any "person[] [or] employer . . . to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice . . . or to attempt . . . to commit any act declared by this section to be an unlawful discriminatory practice."  43 Pa. Cons. Stat. § 955(e).  Jeannot again brings a claim of aiding and abetting against Bard and Britt.  (Second Am. Compl. ¶¶ 72–74.)

Previously, we concluded that Jeannot's aiding and abetting claim failed for two reasons: (1) we had dismissed all primary violations of the PHRA or federal law counterpart, and therefore, the claim could not stand alone; and (2) that, nevertheless, Jeannot failed to plead any facts that Bard and Britt had any relationship to the claims of discrimination. (October Opinion 11–12.) Since Defendants do not move to dismiss the perceived disability claim from Jeannot's Second Amended Complaint, a primary violation survives in this case and allows an accompanying claim for aiding and abetting. Consequently, our first reason for dismissal has been remedied.

However, Jeannot's claim still fails to plead any relationship between Bard and Britt and his claims of discrimination. To find individual liability, a plaintiff must show that a "supervisory employee . . . 'knew or should have known that the [p]laintiff was being subjected to harassment' but 'repeatedly refused to take action to end the harassment directed at [the plaintiff].'" *See Rosh v. Gold Standard Café at Penn, Inc.*, No. 16-1676, 2016 WL 73757014, at *7 (E.D. Pa. Dec. 19, 2016) (quoting *Dici v. Com. of Pa.*, 91 F.3d 542, 553 (3d Cir. 1996)); *see also Davis v. Levy, Angstreich, Finney, Baldante, Rubenstein & Coren P.C.*, 20 F. Supp. 2d 885, 887 (E.D. Pa. 1998) ("[A]n individual supervisory employee can be held liable under an aiding and abetting [theory] for his own direct acts of discrimination or for his failure to take action to prevent further discrimination by an employee under supervision.").

While Jeannot adequately alleges that Bard and Britt had supervisory authority over him, he attempts to attribute the specific actions taken by other employees of the Housing Authority to Bard and Britt. (Pl.'s Resp. in Opp'n 5.) Jeannot argues that Defendants "conducted an investigation, required him to submit to a drug test, placed him on limited duty, and ultimately terminated him." (*Id.*) The Second Amended Complaint, however, does not assert that Bard or

Britt had any direct involvement with any of those actions, aside from signing the May 26, 2017 "Notice of Suspension" attached to Jeannot's Response.  (Pl.'s Resp. Opp'n, Ex. A ("Notice of Suspension").)[6]  Instead, it was Lt. Dunbar that informed Jeannot that he was being placed on restrictive duty and also took Jeannot to the hospital for the drug test.  (Second Am. Compl. ¶¶ 26, 29.)  Additionally, to the extent Jeannot argues that an investigation was conducted, he asserts that it was Lt. Dunbar who asked him questions regarding the shift in question and that it was "Defendants," which includes the Housing Authority, who were asking other officers questions about him.  (*Id.* ¶¶ 27, 36.)

Mere conclusory and non-specific allegations of aiding and abetting are insufficient to survive a motion to dismiss.  *See Miles v. City of Phila.*, No. 11-4040, 2013 WL 125186, at *8 (E.D. Pa. Jan. 10, 2013).  At no point does Jeannot assert that Bard or Britt were aware of any on-going discrimination towards him or that they were directly involved in any such discriminatory acts.  *See Dici*, 91 F.3d at 552–53 (requiring specific allegations that, if true, would constitute aiding and abetting under the PHRA).  Contrarily, in *Rosh*, a case Jeannot heavily relies on, the plaintiff successfully pleaded a claim for aiding and abetting liability by asserting that she had reported multiple instances of sexual harassment to her supervisors to no avail.  *See* 2016 WL 7375014, at *7 (finding that plaintiff alleging that, despite knowledge of harassment, defendants taking no steps to remedy situation was sufficient to properly plead aiding and abetting under the PHRA).

Jeannot's claim is more closely aligned with the plaintiff's claim in *Miles*.  In *Miles*, the court dismissed the plaintiff's aiding and abetting claim where she could not "specifically allege

---

[6] For the purposes of deciding this Motion, we consider Jeannot's attached Notice of Suspension as an undisputedly authentic document upon which multiple claims in the Second Amended Complaint are based.  *See Davis*, 824 F.3d at 341.

that [defendants] intended to aid [the employer's] discriminatory behavior, or shared some common purpose with the [employer] to retaliate." *See id.* (quoting *Destafano v. Henry Michell Co.*, No. 99-5501, 2000 WL 433993, at *3 (E.D. Pa. Apr. 13, 2000)).

Here, Jeannot's sole allegation against Bard and Britt in this case is that they signed the Notice of Suspension in their capacity as Jeannot's supervisors. (Pl.'s Resp. in Opp'n 5–6; Notice of Suspension.) Despite construing all factual inferences in a light most favorable to Jeannot, the Second Amended Complaint does not allege that Bard or Britt shared any intent to discriminate against him or that he had ever informed them that he was being subjected to unlawful discrimination. Bard and Britt were merely carrying out their duties as Chief of Police and Inspector, respectively. *See Destafano*, 2000 WL 433993, at *2 (imposing no liability on an individual defendant "simply upon allegations that the defendant acted within the scope of an employment or agency relationship").

For this reason, Jeannot's aiding and abetting claim cannot survive Defendant's Motion to Dismiss. Accordingly, we dismiss Count IV of the Second Amended Complaint with prejudice.[7]

## C. Jeannot's Equal Protection Claim under Section 1983

Next, we address Jeannot's reasserted claim that Defendants deprived him of his right to equal protection under the Fourteenth Amendment.[8] Jeannot originally withdrew this claim from

---

[7] It is clear that any further attempt to amend this claim would be futile. *See Averbach v. Rival Mfg. Co.*, 879 F.2d 1196, 1203 (3d Cir. 1989). It is abundantly clear that Bard and Britt's only involvement in this case is signing the Notice of Suspension. At no point did Jeannot inform either of them that he was being subjected to unlawful discrimination.

[8] It is unclear whether Jeannot intended to actually reassert this claim. In his Response in Opposition, he admits in a footnote that it was previously withdrawn and he does not include it among the list of remaining claims in this case. (Pl.'s Resp. in Opp'n 1 n.1.) However, it is possible that the footnote was inadvertently carried over from a previous filing in this Court, as the footnote makes no mention of Jeannot's entirely new claim of due process that he added in his Second Amended Complaint. Additionally, Jeannot provides a brief, two-sentence defense of his equal protection claim in his Response. For these reasons, we address Jeannot's equal protection claim on the merits.

his First Amended Complaint, but has renewed the claim word-for-word in his Second Amended Complaint. (*Compare* First Am. Compl. ¶¶ 65–78, *with* Second Am. Compl. ¶¶ 75–88.) However, Jeannot's claim fails to properly plead violations of the equal protection clause and must be dismissed.

The Supreme Court of the United States has adopted multiple approaches to claims of equal protection violations. *See, e.g.*, *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973). Generally, "[a] violation of the Equal Protection Clause may exist when government action 'discriminates against a "suspect class," or it interferes with a "fundamental right."'" *Woodson v. Prime Care Med., Inc.*, No. 12-4919, 2013 WL 247372, at *5 (E.D. Pa. Jan. 23, 2013) (quoting *Brown v. Borough of Mahaffey*, 35 F.3d 846, 850 (3d Cir. 1994)). Courts must analyze these claims under a strict scrutiny standard. *San Antonio Sch. Dist.*, 411 U.S. at 16–17 (holding it is government's burden to demonstrate action is narrowly tailored to serve legitimate objectives and is the "'less drastic means' for effectuating its objectives").

However, where a plaintiff cannot prove that he is a member of a protected class or that the government has interfered with a fundamental right, he may bring his claim under a "class-of-one" theory. *See Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 595 (2008). A claim under this theory is subjected to a rational basis test and the plaintiff must prove that he was "intentionally treated differently from others similarly situated." *Id.* at 601 (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)); *see also Keenan v. City of Phila.*, 983 F.2d 459, 465 (3d Cir. 1992).

The United States Court of Appeals for the Third Circuit ("Third Circuit") has held that to succeed on a "class-of-one" claim, "a plaintiff must allege that (1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was

no rational basis for the difference in treatment." *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006); *see also Olech*, 528 U.S. at 563 ("[T]he state action was motivated solely by a spiteful effort to get him for reasons wholly unrelated to any legitimate state objective."). However, a "class-of-one" theory of equal protection is unavailable "in the public employment context." *Engquist*, 553 U.S. at 594, 599 (citing *O'Connor v. Ortega*, 480 U.S. 709, 721–22 (1987); *Bishop v. Wood*, 426 U.S. 241, 250 (1976)) ("[W]e have often recognized the government has significantly greater leeway in its dealings with citizen employees than it does when it brings its sovereign power to bear on citizens at large.").

Here, Jeannot initially argues that defendants discriminated against him by terminating him "because of his . . . perceived disability." (Second Am. Compl. ¶ 76.) To the extent Jeannot claims that this qualifies for review under the strict scrutiny standard, he is incorrect. A person claiming an alleged disability is not a member of a suspect class. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 445–46 (1985) (including disability as "a characteristic that the government may legitimately take into account in a wide range of decisions [which the Court] will not presume that any given legislative action . . . is rooted in considerations that the Constitution would not tolerate."); *see also* 42 U.S.C. § 12102(2) (defining disability to include "being regarded as having such an impairment"). Furthermore, it is well settled that there is no fundamental right to government employment. *See Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 313 (1976) (citing *San Antonio Sch. Dist.*, 411 U.S. at 28; *Lindsey v. Normet*, 405 U.S. 56, 73 (1972); *Dandridge v. Williams*, 397 U.S. 471, 485 (1970)); *Malmed v. Thornburgh*, 621 F.2d 565, 570 (3d Cir. 1980) ("[T]he interest . . . in public employment [is not] a fundamental interest.").

Additionally, it also appears Jeannot attempts to state his equal protection claim under a "class-of-one" theory. (Second Am. Compl. ¶¶ 77–84 ("Defendants' actions and omissions were also malicious, reckless, callous and deliberately indifferent to Plaintiff's federally protected rights and shocks the conscience.")).[9] This claim fails for two reasons. First, as noted above, this theory is unavailable to Jeannot in a public employment matter. *See Engquist*, 553 U.S. at 594. Second, Jeannot cannot satisfy the first element, as he does not allege the existence of any similarly situated individuals who were treated differently. *See Hill*, 455 F.3d at 239 (citing *Levenstein v. Salafsky*, 414 F.3d 767, 776 (7th Cir. 2005)) (holding a claim must fail where the plaintiff fails to "identify another similarly situated individual who had been treated differently").

Therefore, Jeannot's claim for a violation of his equal protection rights cannot survive Defendants' Motion to Dismiss. Accordingly, this claim is dismissed with prejudice because amendment would be futile.

### D.    Jeannot's Due Process Claim under Section 1983

Finally, Jeannot brings a wholly new claim in his Second Amended Complaint, alleging that Defendants deprived him of his right to procedural due process of law under the Fourteenth Amendment. "Due process of law" essentially requires that the government provide a person with notice and opportunity to be heard in connection with the deprivation of life, liberty, or property. *See Zappan v. Pa. Bd. of Prob. & Parole*, 152 F. App'x 211, 220 (3d Cir. 2005) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985)). To establish a procedural due

---

[9] Specifically, this claim resembles a subset of the "class-of-one"theory: "vindictive class-of-one." *See Esmail v. Macrane*, 53 F.3d 176, 180 (7th Cir. 1995). The Supreme Court considers an allegation of "vindictive action," "illegitimate animus," or "ill will" an extra factor to "class-of-one" theory cases where differential treatment is the result of "uneven enforcement." *Olech*, 528 U.S. at 566 (Breyer, J., concurring) (quoting *Olech v. Vill. of Willowbrook*, 160 F.3d 386, 388 (7th Cir. 1998)).

process violation, "a plaintiff must establish: (1) the existence of a liberty or property interest; (2) that the state deprived the person of it; and (3) that the deprivation was accomplished without the procedural protections of notice and an opportunity to be heard." *Johnson v. Wenerowicz*, No. 10-5027, 2011 WL 1399809, at \*5 (E.D. Pa. Apr. 8, 2011) (Kelly, J.).

Jeannot attempts to argue what appear to be two separate theories of due process violations by Defendants. (*See* Pl.'s Resp. in Opp'n 6–7.) First, Jeannot argues that he has a property interest in his position as a municipal police officer and that Defendants deprived him of that interest without conducting either "pre-termination or post-termination proceedings." (*Id.* at 6.) Second, Jeannot believes that he has a liberty interest in his "right to take his prescriptions and protect his physical and mental health." (*Id.* at 7.) According to Jeannot, that liberty interest was "stripped" from him when Defendants "failed to follow their procedures for conducting the drug test, failed to inform [him] of the . . . test results, engaged in [an] adverse employment action by suspending and terminating him, retaliated against him after he complained about [their] illegal and improper conduct, and otherwise punished him for simply taking his prescriptions." (*Id.*)

1.    Jeannot's Deprivation of Liberty Interest Claim

We begin by quickly addressing Jeannot's second, and more novel, argument. Aside from a handful of generic references to Article I, Section 1 of the Constitution of the Commonwealth of Pennsylvania, Jeannot offers no legal or factual basis to support his claim that he was deprived of a liberty interest without due process. "The liberty interests protected by procedural due process are broad in scope." *Robb v. City of Phila.*, 733 F.2d 286, 293 (3d Cir. 1984). However, "[a]n employment action implicates a fourteenth amendment liberty interest only if it (1) is based on a 'charge against [the individual] that might seriously damage his

standing and associations in the community . . .' or (2) 'impose[s] on him a stigma of other

disability that forecloses his freedom to take advantage of other employment opportunities.'" *Id.*

at 294 (alterations in original) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 573 (1972)).

Furthermore, to "state a valid claim of a protected liberty interest, 'a plaintiff must plead that the

allegedly stigmatizing information was "published" or otherwise disseminated by his

government employer to the public.'" *Anderson v. City of Phila.*, 845 F.2d 1216, 1222 (3d Cir.

1988) (quoting *Chabal v. Reagan*, 841 F.2d 1216, 1223 (3d Cir. 1988)).

Here, Jeannot's claim that he was deprived of his ability to take Adderall does not meet

the necessary standard for a liberty interest under an employment action. It is unclear how a

prescription for Adderall would negatively impact his standing in the community or create a

stigma that would foreclose other employment opportunities. *See Robb*, 733 F.2d at 294.

Moreover, Jeannot does not allege that these charges were ever published or disseminated by

Defendants, as he must to survive a motion to dismiss. *See Anderson*, 845 F.2d at 1222 (holding

where adverse action may negatively reflect on plaintiff, deprivation of liberty interest claim

cannot survive when action was not published).

Furthermore, even if true that there is an "inherent and indefeasible right" for an

individual to take Adderall, it is unclear how Defendants deprived Jeannot of that right. (Pl.'s

Resp. in Opp'n 7.) None of the alleged conduct on behalf of Defendants, in fact, prevents

Jeannot from taking his medication. (*Id.*) Therefore, Jeannot clearly cannot satisfy the second

element of a due process claim on this theory.

Accordingly, Jeannot fails to state a claim for a deprivation of a liberty interest in

violation of his right to due process.

2. <u>Jeannot's Deprivation of Property Interest Claim</u>

Regarding Jeannot's alleged due process claim concerning his termination from the Housing Authority, Defendants waive away this claim by asserting that Jeannot does not allege any property interest. (Defs.' Br. in Supp. Mot. to Dismiss 8.) However, Jeannot adequately establishes a property interest in his continued employment. (*Id.* at 6.) The Third Circuit has held that a "for-cause" termination provision in an employment agreement may establish a protected property interest. *See Solomon v. Phila. Hous. Auth.*, 143 F. App'x 447, 452 (3d Cir. 2005) (citing *Linan-Faye Constr. Co., Inc. v. Hous. Auth. of City of Camden*, 49 F.3d 915, 932 (3d Cir. 1995)). "Moreover, 'under Pennsylvania law, suspensions, like dismissals[,] are only proper for just cause; therefore, [employees have] a separate property interest in not being suspended.'" *Id.* (quoting *Gniotek v. City of Phila.*, 808 F.2d 241, 243 n.5 (3d Cir. 1986)). Accordingly, "public employees who may be dismissed only for cause are entitled to a very limited hearing prior to termination, to be followed by a more comprehensive post-termination hearing." *Id.* at 453.

A pre-termination proceeding, essentially, provides an employee "notice and opportunity for hearing appropriate to the nature of the case." *Loudermill*, 470 U.S. at 542 (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950)). "Notice is sufficient if it apprises the vulnerable party of the nature of the charges and general evidence against him, and if it is timely under the particular circumstances of the case." *Solomon*, 143 F. App'x at 455 (citing *Goss v. Lopez*, 419 U.S. 565, 581 (1975)). A pre-termination hearing is merely "an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Gilbert v. Homar*, 520 U.S. 924, 929 (1997) (quoting *Loudermill*, 470 U.S. at 545–46).

Jeannot argues that Defendants "failed to conduct either a 'pre-termination or post-termination proceeding.'" (Pl.'s Resp. in Opp'n 6.) Based on the allegations set forth in the Second Amended Complaint, we agree.

By arguing that he was terminated on suspicion of drug abuse, Jeannot asserts that Defendants failed to provide him a proper pre-termination proceeding. While Jeannot was informed by Lt. Dunbar and various union representatives that he was under suspicion of drug abuse, the Notice of Suspension he was provided does not mention drug abuse or the results of his drug test among the six violations it details. (Second Am. Compl. ¶¶ 29, 32–35; Notice of Suspension.) Jeannot further asserts that he was repeatedly denied a clear answer as to the reason for Defendants' suspicions of potential drug abuse and decision to terminate him. (Second Am. Compl. ¶ 43.) In accepting the facts as true and drawing all reasonable inferences in favor of Jeannot, as we must, it appears that Jeannot never received a hearing, as provided for in *Loudermill*, to address claims regarding Defendants' suspicion of drug abuse. *See* 470 U.S. at 543–43 (finding pre-termination hearing is needed to balance employee's interest in retaining employment and government's interest in expeditious removal of unsatisfactory employee and administrative burdens).

As for any post-termination process, it is plain that if Jeannot was terminated because of drug abuse discovered under reasonable suspicion and a compelled drug test, he would be entitled to rebut such evidence, including the results from the drug test, at a post-termination hearing. *See Copeland v. Phila. Police Dep't*, 840 F.2d 1139, 1145–46 (3d Cir. 1988) (finding oral disclosure of results of urinary analysis was sufficient to provide plaintiff notice of charges and opportunity to respond). Since Jeannot asserts that he still has not been made aware of the

results of his drug test, it is impossible for him to respond to Defendants' supposed charge of drug abuse. (Second Am. Compl. ¶¶ 43, 46.)

For these reasons, Jeannot has sufficiently pleaded a claim for a violation of procedural due process with respect to his termination on the grounds of drug abuse. Defendant's Motion to Dismiss is denied as it relates to the due process claim against the Housing Authority in Count VI.

### 3. Jeannot's Due Process Claims against Bard and Britt

Finally, Defendants move to dismiss Jeannot's due process claim in Count VI as it relates to Bard and Britt, specifically. Defendants argue that Jeannot has not alleged sufficient facts to state a claim of due process violations against Bard or Britt in their official or personal capacities. We agree and dismiss the due process claims against Bard and Britt in Count VI.

#### a. *Bard and Britt's Liability in their Official Capacities*

To the extent Jeannot includes Bard and Britt in his due process claim as a means to hold the Housing Authority liable, it is clear from the facts he alleges that no such claim is present. "Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (quoting *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690, n.55 (1978)). To state such a claim, a plaintiff must prove the municipality is liable in one of three ways: (1) the official "acted pursuant to a formal government policy or standard operating procedure long accepted within the government entity"; (2) the official has "policy making authority rendering his or her behavior an act of official government policy"; or (3) the official with authority "has ratified the unconstitutional actions of a subordinate, rendering such behavior official for liability purposes." *McGreevy v. Stroup*, 413 F.3d 359, 367 (3d Cir. 2005) (quoting *Jett v. Dall. Indep. Sch. Dist.*,

491 U.S. 701, 737 (1989); *City of St. Lous v. Praprotnik*, 485 U.S. 112, 127 (1988); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986)).

We can easily dismiss the first theory of liability, as the Second Amended Complaint consistently alleges that the Housing Authority's established policies and procedures were *not* followed. (*See* Second Am. Compl. ¶¶ 31, 38–40, 42, 44, 56.) Likewise, Jeannot has not pleaded any specific policy or long accepted procedure that was carried out against him.

As for the second theory of liability, "it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *McGreevy*, 413 F.3d at 368 (quoting *Pembaur*, 475 U.S. at 480). Here, Jeannot does not allege that Bard or Britt had final policymaking authority over personnel decisions. *See Pembaur*, 475 U.S. at 483 (holding liability for officials with merely limited policymaking authority is tantamount to *respondeat superior* claims, which is unavailable in municipal liability cases). However, regardless of Bard and Britt's policymaking authority, Jeannot's claim fails because he does not allege their conduct was unconstitutional. As we discussed previously, the only action allegedly taken by Bard and Britt was to sign Jeannot's Notice of Suspension. (Notice of Suspension; *see also supra* Section IV-B.) This action establishes only that Bard and Britt made the decision to suspend Jeannot with the intent to terminate. However, Jeannot does not allege that Bard or Britt made the decision to deprive him of his due process rights. *See Pembaur*, 475 U.S. at 483 ("We hold that municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made . . . by the official or officials responsible for establishing final policy with respect to the subject matter in question.") Therefore, he cannot hold the municipality liable for their actions in signing the Notice of Suspension.

Relatedly, the third theory of liability fails for similar reasons. It is clear from Jeannot's factual allegations that Bard and Britt did not authorize any decision made by a subordinate to deprive Jeannot of his due process rights. To properly allege that a policymaker ratified a subordinate's decision, a plaintiff must show that the policymaker approved of the decision, as well as *the basis* for the decision. *See Praprotnik*, 485 U.S. at 127. Here, Jeannot plainly does not allege that Bard or Britt knew that by signing the Notice of Suspension, Jeannot would allegedly be deprived of his due process rights.

Accordingly, Jeannot cannot hold Bard and Britt liable in their official capacities for any due process violation claim.

b.      *Bard and Britt's Personal Liability*

"Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law." *Graham*, 473 U.S. at 165. Unlike official-capacity suits, personal claims cannot impose liability upon a government entity. *Id.* at 167–68 ("A victory in a personal-capacity action is a victory against the individual defendant, rather than against the entity that employs him."). To impose personal liability under § 1983, a plaintiff is required "to allege, and be prepared to prove, that the defendant has been personally and directly involved in the alleged wrongful conduct or alternatively that the alleged wrongful conduct occurred within the defendants' actual knowledge and acquiescence." *Johnakin v. City of Phila.*, No. 95-1588, 1996 WL 18821, at *7 (E.D. Pa. Jan. 18, 1996) (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)).

As we have stated, Jeannot has failed to allege any factual allegations against Bard and Britt beyond the extent that they signed the Notice of Suspension. The Second Amended Complaint contains no allegations that Bard or Britt were at all involved in allegedly depriving

Jeannot of due process.  Additionally, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Lynch v. City of Phila.*, 166 F. Supp. 2d 224, 232 (E.D. Pa. 2001) (quoting *Wilson v. Layne*, 536 U.S. 603, 615 (1999)) ("The constitutional right violated 'must be defined at the appropriate level of specificity before a court can determine if it was clearly established.'").  Based on the facts pleaded, it is unclear how Bard or Britt could have known their actions would allegedly violate Jeannot's due process rights.

Accordingly, Defendants' Motion to Dismiss is granted to the extent it seeks to dismiss Count VI against individual defendants Bard and Britt.  Since the factual allegations establish Bard and Britt's limited involvement in this case, Jeannot's due process claim against Bard and Britt is dismissed with prejudice.

IV.     **CONCLUSION**

For the reasons stated above, Defendants' Motion to Dismiss the Second Amended Complaint is granted in part and denied in part.  The following claims are dismissed with prejudice: actual disability in Counts I and II; retaliation in Count III; an FMLA violation in paragraph 51; aiding and abetting liability against Bard and Britt in Count IV; equal protection violation in Count V; and due process violations against Bard and Britt in Count VI.   However, Defendants' Motion is denied to the extent it seeks to dismiss Jeannot's procedural due process violation against the Housing Authority in Count VI.

An appropriate Order follows.